**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-2499**

———————

PRECON DEVELOPMENT CORPORATION, INCORPORATED,

Plaintiff – Appellant,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant – Appellee.

-----------------------

ROBERT B. ATKINSON; KIRK J. HAVENS; CARLTON H. HERSHNER, JR.; JAMES PERRY; DANIEL L. TUFFORD; JOY B. ZEDLER,

Amici Supporting Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Rebecca Beach Smith, Chief District Judge. (2:08-cv-00447-RBS-TEM)

———————

Argued: December 10, 2014            Decided: March 10, 2015

———————

Before SHEDD, DIAZ, and FLOYD, Circuit Judges.

———————

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Shedd and Judge Floyd joined.

———————

**ARGUED:** Douglas E. Kahle, WOLCOTT RIVERS GATES, Virginia Beach, Virginia, for Appellant. Mary Gabrielle Sprague, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Glen M. Robertson, WOLCOTT RIVERS GATES, Virginia Beach,

Virginia, for Appellant. Sam Hirsch, Acting Assistant Attorney General, Katherine W. Hazard, Environment & Natural Resources Div., Appellate Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Deborah M. Murray, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia; Jan Goldman Carter, NATIONAL WILDLIFE FEDERATION, Washington, D.C., for Amici Curiae.

---

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

This appeal is the latest installment in a thirteen-year battle between Precon Development Corporation and the U.S. Army Corps of Engineers about whether the Corps has jurisdiction under the Clean Water Act over Precon's Edinburgh development[1] in Chesapeake, Virginia. This episode involves 4.8 acres of wetlands that Precon wants to fill to build ten homes. The Corps asserted jurisdiction over these wetlands and denied Precon's permit application.[2] We previously remanded this case after concluding that the Corps had not provided sufficient evidence to support its jurisdiction. Finding that the Corps has now amassed adequate evidence, we affirm.

I.

Our opinion in Precon Development Corp. v. U.S. Army Corps of Engineers (Precon I), 633 F.3d 278 (4th Cir. 2011), provides a detailed account of the law and facts of this case. We briefly recap here only what is necessary to resolve the current appeal.

---

[1] Edinburgh is a "planned unit development" that "contains shopping centers, a light industrial complex, and residential homes in several neighborhoods." Appellant's Br. at 3.

[2] Precon has not challenged the denial of its permit application in its appeals to this court.

In Precon I, we found that the applicable law for evaluating the Corps' assertion of jurisdiction over Precon's wetlands was the significant nexus test from Justice Kennedy's opinion concurring in the judgment in Rapanos v. United States, 547 U.S. 715 (2006).[3]  When wetlands, such as Precon's, are adjacent to tributaries of traditional navigable waters, the Corps must make a case-specific showing that a "'significant nexus' exists 'between the wetlands in question and navigable waters in the traditional sense.'"  Precon I, 633 F.3d at 288 (quoting Rapanos, 547 U.S. at 779, 782 (Kennedy, J., concurring in the judgment)).  A significant nexus exists when "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of" traditional navigable waters.  Id. at 289 (quoting Rapanos, 547 U.S. at 780).  No significant nexus exists when the "wetlands' effects on water quality [of traditional navigable waters] are speculative or insubstantial."  Id. (quoting Rapanos, 547 U.S. at 780).

_____

[3] We are bound by Precon I's statement of the applicable law under the law of the case doctrine. See TFWS, Inc. v. Franchot, 572 F.3d 186, 191 (4th Cir. 2009) ("[O]nce the decision of an appellate court establishes the law of the case, it 'must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal . . . .'") (quoting United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999)).

Here, the relevant geographic region encompasses 448 acres of similarly situated wetlands, including Precon's 4.8 acres. We previously upheld this aggregation. Id. at 293. The relevant traditional navigable water is the Northwest River. The path from the wetlands to the river is as follows: Precon's 4.8 acres are adjacent to a 2,500-foot long man-made drainage ditch. The 2,500-foot Ditch connects to the Saint Brides Ditch.[4] About three miles downstream, the Saint Brides Ditch joins another tributary. Together, these tributaries form a channel that flows into the Northwest River. The distance from the 4.8 acres to the Northwest River is about seven miles.[5]

During our first review of this case, we found that the Corps adequately established a nexus between the 448-acre wetlands and the Northwest River. Id. at 295 & n.14. But we nonetheless remanded because the Corps' administrative record lacked evidence of significance. Id. at 295.

We identified two deficiencies in the administrative record. First, while the record contained evidence of water storage capacity and potential flow rates, it lacked any

---

[4] The Corps considered the 2,500-foot Ditch and the Saint Brides Ditch collectively as the relevant "tributary" to which the 448 acres of similarly situated wetlands are adjacent. We approved this appellation in Precon I. 633 F.3d at 292.

[5] An aerial map of the region appears in the appendix to this opinion.

information as to actual flow.  Id. at 294.  Second, we noted that although the record showed that "the wetlands and their adjacent tributaries trap sediment and nitrogen and perform flood control functions," the record was silent on whether "the Northwest River suffers from high levels of nitrogen or sedimentation, or it if is ever prone to flooding." Id. at 295.

On remand, the Corps expanded its administrative record and again concluded that it had jurisdiction.  Precon appealed this conclusion administratively and then to the district court.  The district court granted the Corps' motion for summary judgment, and Precon appealed.

We review de novo the district court's grant of summary judgment.  Id. at 289.  We also review de novo the Corps' compliance with the significant nexus test, but apply Skidmore[6] deference to the extent that the Corps' interpretation of the test is persuasive.  Precon I, 633 F.3d at 289-90, 291, 296.  We defer to the Corps' factual findings unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id. at 292 (quoting 5 U.S.C. § 706(2)(A)).

_____

[6] Skidmore v. Swift, 323 U.S. 134 (1944).

6

II.

Precon argues that the Corps' administrative record still fails to show a significant nexus between the wetlands in question and the Northwest River. We disagree.

A.

Before evaluating the new evidence of significance, we begin with some general observations that inform our approach to this case. First, the significant nexus test is a "flexible ecological inquiry." Id. at 294 (citing Rapanos, 457 U.S. at 799-80). Quantitative or qualitative evidence may support the Corps' jurisdiction. Id. at 294. Thus, we find unpersuasive Precon's repeated argument that the Corps cannot meet its burden because the 448-acre wetlands make up a small percentage of the Northwest River watershed. As the Corps points out, this would destroy the Corps' jurisdiction through "death by a thousand cuts." Appellee's Br. at 54.

Second, Precon relies heavily on the report of one of its experts, Dr. Lawrence B. Cahoon, in which he opined that none of the wetlands' functions has a significant effect on the Northwest River. However, Dr. Cahoon framed significance as something approaching statistical significance. This sets the bar too high, as purely qualitative evidence may satisfy the significant nexus test.

Third, although we evaluate the functions of the wetlands individually, the ultimate inquiry is whether the collective effect of these functions is significant. In Precon I, we approved of the Corps' holistic approach to its jurisdictional determinations. 633 F.3d at 283 (describing the Corps' process as first "assessing the flow characteristics and functions" of the tributary and adjacent wetlands and then "evaluat[ing] whether these factors are likely to have an effect that is more than speculative or insubstantial on the chemical, physical, and biological integrity of a traditional navigable water" (internal quotation marks omitted)).

Lastly, the Clean Water Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2012) (emphasis added). As the district court observed, this case falls into the maintenance category because it is a permitting case, not a civil enforcement action. That informs the type of evidence a reviewing court can expect the Corps to submit. In a civil enforcement action, the damage has been done because the wetlands have already been filled. In the permitting context, however, the Corps exercises its jurisdiction to prevent damage and thus cannot be expected to present evidence of the actual ecological impact of the wetlands on downstream waters.

8

B.

We first consider the Corps' new evidence on tributary flow measurements. The administrative record now contains the City of Chesapeake's flow rate calculations and evidence from the Corps' April and August 2012 site visits.

No government agency has placed flow gauges in the 2,500-foot Ditch, the Saint Brides Ditch, or the Northwest River. But the City of Chesapeake has calculated positive flow rates from two-year, ten-year, and fifty-year storm events[7] at three locations: the intersection of the 2,500-foot Ditch and the Saint Brides Ditch, in the Saint Brides Ditch 2,250 feet downstream from that intersection, and at the farthest point downstream where the Saint Brides Ditch and the 448-acre wetlands are adjacent.[8] The City of Chesapeake relies on these calculations to manage storm waters.

---

[7] By this hydrologists mean the probability of a certain-size storm occurring during a given year. Thus, a two-year storm event has a 1 in 2 (or 50%) chance of occurring in a given year. A fifty-year storm event has a 1 in 50 (or 2%) chance of occurring in a given year. See Floods: Recurrence Intervals and 100-year Floods, U.S. Geological Survey, http://water.usgs.gov/edu/100yearflood.html (last updated Nov. 12, 2014) (saved as ECF opinion attachment).

[8] The particulars are as follows: At the intersection of the 2,500-foot Ditch and the Saint Brides Ditch, the flow rate is 24 cubic feet per second (cfs), 58 cfs, and 84 cfs for two-year, ten-year, and fifty-year storm events, respectively. In the Saint Brides Ditch 2,250 feet downstream, the respective flow rates are 28 cfs, 60 cfs, and 89 cfs. At the end point where
(Continued)

9

In addition to flow rate calculations, the record now contains photographs documenting the Corps' site visits and showing flow in the Saint Brides Ditch. In April 2012, Corps personnel observed flow in the Saint Brides Ditch where it crosses Saint Brides Road, which is downstream of the intersection of the 2,500-foot Ditch and the Saint Brides Ditch. The Corps has explained that this crossing is "the closest downstream observation point." J.A. 53.

In August 2012, Corps personnel again visited the area and observed obvious flow in the Saint Brides Ditch where it crosses Saint Brides Road. The Corps did not observe flow at the intersection of the 2,500-foot Ditch and the Saint Brides Ditch, but explained this as "likely the result of debris forming a dam" somewhere between the intersection with the 2,500-foot Ditch and the Saint Brides Road crossing point. Id.

One of Precon's experts, Chester James Cahoon, III, observed no measurable flow at the intersection of the 2,500-foot Ditch and the Saint Brides Ditch during biweekly site visits from mid-September to mid-December 2011. But the Corps found the evidence gathered during its own site visits and the

the Saint Brides Ditch is adjacent to the 448-acre wetlands, the respective flow rates are 93 cfs, 241.4 cfs, and 376 cfs. A flow of 1 cfs "is about 450 gallons per minute." Floods: Recurrence Intervals and 100-year Floods, supra n.7.

City of Chesapeake's flow rate calculations to be more reliable because the region experienced lower than normal rainfall from October to December 2011. Mr. Cahoon himself noted the "below normal" precipitation during this time period. J.A. 460. Because the Corps' decision to credit certain evidence in the record over other conflicting evidence is neither arbitrary nor capricious, we defer to the Corps' factual finding on this point. See 5 U.S.C. § 706(2)(A).

In sum, the Corps has improved on its earlier record, which was limited to evidence of water storage capacity and potential flow rates. However, tributary flow alone cannot establish jurisdiction, so we now consider the Corps' new evidence on the significance of the wetlands' functions.

C.

The wetlands perform three functions that relate to the condition of the Northwest River: they trap nitrogen, store water, and slow water flow to the river. We earlier found the record deficient because it lacked any information about the river's condition. Now, the Corps' administrative record includes three new reports on this subject. These reports--the January 2011 "Total Maximum Daily Load Development for the Northwest River Watershed, A Total Phosphorous TMDL Due to Low Dissolved Oxygen Impairment"; the March 2010 "City of Chesapeake: A Plan for the Northwest River Watershed"; and the

11

Virginia Department of Environmental Quality's "Final 2010 305(b)/303(d) Water Quality Assessment Integrated Report" (the "Integrated Report")--conclusively establish that the Northwest River suffers from low dissolved oxygen. In particular, the Integrated Report shows that the river suffers from this impairment at the point where it connects to the Saint Brides Ditch.

According to these reports, dissolved oxygen is one of the most important measures of water quality for aquatic life, and one characteristic of nutrient-rich streams is low dissolved oxygen. The two most important nutrients in Virginia's rivers are nitrogen and phosphorous. Recent testing on the Northwest River showed elevated phosphorous levels, and state environmental agencies have adopted a plan to reduce phosphorous in the river.

Precon contends that the wetlands' nutrient-trapping function is irrelevant because the Northwest River has elevated phosphorous, not nitrogen, levels. This argument misses the point. The record now, unlike before, shows that the Northwest River is vulnerable because it is impaired from low dissolved oxygen. It also demonstrates that phosphorous and nitrogen are both nutrients, and an overabundance of nutrients causes low dissolved oxygen. Filling the wetlands would prevent them from trapping nitrogen, which in turn would exacerbate the Northwest

12

River's dissolved oxygen deficiency by adding nitrogen to the river's already elevated phosphorous levels.

Additionally, the record now shows that the Northwest River has flooded twice in the past fifteen years. And the record contains evidence of flooding in a subdivision across the Saint Brides Ditch from Precon's development. While not particularly compelling in isolation, this evidence of flooding further bolsters the Corps' contention that the wetlands' functions of storing water and slowing flow are significant.

D.

The Corps has also documented that the wetlands perform beneficial functions for food-chain support and wildlife. Specifically, the Corps determined that fish in "the Northwest River located downstream from the subject wetlands benefit from the carbon sequestration occurring in the subject wetlands." J.A. 367.[9]

---

[9] Carbon sequestration occurs when

> vegetation takes in carbon dioxide (CO2) from the atmosphere as part of the photosynthesis process and the carbon is incorporated in the vegetation biomass. Carbon, which is a component of organic material such as leaves, is also important because it provides food for the bottom level of the food chain, which in turn supports higher trophic species such as fish in downstream waters . . . .

J.A. 367.

13

One of Precon's experts, Dr. Lawrence B. Cahoon, offered a contrary opinion, which the Corps considered and rejected. In doing so, the Corps relied on other evidence that headwater wetlands and streams, like the 448-acre wetlands, 2,500-foot Ditch, and Saint Brides Ditch, can be "important sources" of organic matter. J.A. 49. And the Corps noted that the 448-acre wetlands, the 2,500-foot Ditch, and the Saint Brides Ditch are mostly wooded, and trees and their leaves contribute organic matter for carbon sequestration. Once again, we defer to the Corps' factual finding on this issue.

In addition, the Corps found that the 448-acre wetlands provide a habitat for species such as "deer, squirrels, songbirds, reptiles, and amphibians." J.A. 368. The Corps also had evidence from the Virginia Department of Conservation and Recreation and its own site visits that an endangered species of rattlesnake inhabits the wetlands. And the Department documented endangered eastern big-eared bats nearby.

Dr. Cahoon, on the other hand, did not see any fish, wading birds, fish-eating birds, water fowl, or aquatic mammals when he visited the area on February 4, 2012. But the Corps again found Dr. Cahoon's observations unpersuasive based on its own August 2012 visit during which fish were observed in the 2,500-foot Ditch where it intersects with the Saint Brides Ditch, and the undisputed evidence that the wetlands are a habitat for non-

14

aquatic mammals.  The Corp's decision to reject Dr. Cahoon's finding was within its discretion, especially given that cold temperatures and low rainfall in February 2012 made the region unappealing to fish.

## III.

For the above reasons, we hold that the Corps has satisfied its obligation on remand to marshal evidence in support of its decision to assert jurisdiction over the disputed wetlands. Consequently, the district court's grant of summary judgment to the Corps is

AFFIRMED.



J.A. 36.