Fernando M. Olguin, United States District Judge
Having reviewed and considered all the briefing filed with respect the Motion for Partial Summary Judgment, (Dkt. 252, "Motion"), filed by plaintiff United States of America (the "government"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78 ; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.
INTRODUCTION [1]
On February 28, 2013, plaintiffs United States of America, the State of California, ex rel. California Department of Fish and Wildlife and the California Central Coast Regional Water Quality Control Board, (collectively, "plaintiffs") filed the operative First Amended Complaint ("FAC") against HVI Cat Canyon, Inc., formerly known as Greka Oil & Gas, Inc. ("defendant" or "HVI"), asserting claims for: (1) violations of § 311 of the Clean Water Act (the "CWA"), 33 U.S.C. § 1321(b) ; (2) violations of § 301 of the CWA, 33 U.S.C. § 1311(a) ; (3) failure to prepare and implement and/or maintain an Oil Pollution and Prevention program required under 40 C.F.R. Part 112; (4) failure to prepare and submit facility response plans in accordance with 40 C.F.R. § 112.20 ; (5) recovery of removal costs under § 1002(a) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702(a) ; (6) violations of California Water Code § 13350 ; (7) violations of California Water Code § 13385 ; (8) violations of California Fish and Game Code § 5650 ; (9) recovery of natural resource damages pursuant to California Fish and Game Code § 12016 ; and (10) recovery of costs pursuant to California Fish and Game Code § 13013(c). (See Dkt. 56, FAC).
Defendant filed a Motion for Partial Summary Judgment, (Dkt. 92), which the *1053 court largely denied on September 30, 2016. See United States v. HVI Cat Canyon, Inc., 213 F.Supp.3d 1249 (C.D. Cal. 2016). The government now moves for summary judgment on defendant's liability: (1) under § 311(b) of the CWA, 33 U.S.C. § 1321, for 12 spills alleged in the FAC (collectively, "the 12 spills"); (2) for the 12 spills under § 301(a) of the CWA, 33 U.S.C. § 1311(a) ; (3) for the government's removal costs in connection with six spills or threatened spills under § 1002(a) of the OPA, 33 U.S.C. § 2702(a) ; and (4) for removal costs in the amount of $2,486,884.77 plus interest.[2] (See Dkt. 252-1, Joint Brief ("Jt. Br.") at 1-2).
STATEMENT OF FACTS [3]
I. DISCHARGES FROM THE DAVIS FACILITY INTO ZACA TRIBUTARY.
Defendant owned and operated an oil production facility located in Los Olivos, California ("Davis Facility"). (See Dkt. 252-2, SUF at P2-P3). On December 7, 2005, and January 5, 2008, oil spilled from the Davis Facility reached a creek the government refers to as "Zaca Tributary." (See id. at P57-P58). Zaca Tributary is a tributary to Zaca Creek, which in turn is a tributary to the Santa Ynez River. (See id. at P61-P62). The Santa Ynez River is a tributary to the Santa Ynez River Estuary, a traditional navigable water ("TNW") flowing into the Pacific Ocean. (See id. at P63-P65).
II. DISCHARGES FROM THE BELL FACILITY INTO PALMER ROAD CREEK, CAT CANYON CREEK AND SPRING CANYON TRIBUTARY.
Defendant also owned and operated an oil production facility in Santa Maria, California ("Bell Facility"). (See id. at P4). Oil discharged from the Bell Facility reached the "Palmer Road Creek" on June 8, 2005, July 13, 2005, July 16, 2007, December 7, 2007, January 29, 2008, October 14, 2010, and December 21, 2010.[4] (See id. at P31-P37). Palmer Road Creek is a tributary to the "Sisquoc Creek," a tributary of the Cat Canyon Creek which itself is a tributary to the Sisquoc River. (See Dkt. 252-2, SUF
*1054 at P41-P43). Sisquoc River is a tributary of the Santa Maria River, which is a tributary to the Santa Maria River Estuary, a TNW flowing into the Pacific Ocean. (See id. at P44-P47).
In addition, oil spilled from the Bell Facility on August 11, 2005, reached the "Cat Canyon Creek." (See id. at P48). Following spills from the Bell Facility on December 27, 2008, and May 1, 2009, oil also reached the "Spring Canyon Tributary." (See id. at P51-P52).
III. WILLIAM B FACILITY TANK FARM AND BELL FACILITY GATO PONDS.
Defendant also owned a tank farm located at what the parties call the Williams B Facility. (See Dkt. 252-2, SUF at P140 & P142). On March 12, 2008, the Environmental Protection Agency ("EPA") visited the tank farm and found that "eight 10,000 gallon tanks in the facility containing crude oil, produced water, and sludge were corroded and actively leaking[,]" "the ground around the tanks was heavily saturated with oil[,]" and the tank farm did not have a secondary containment. (Id. at P144-P146). The EPA ordered the removal of the tanks. (See id. at P168).
In addition, the Bell Facility contained "surface impoundments" called Gato Ponds "located approximately 100 feet south and upgradient of Sisquoc Creek." (Dkt. 252-2, SUF at P147-P148). On April 15, 2008, the EPA visited the Gato Ponds and found that crude oil and produced water from the Blochman Injection Pond was draining into the Gato Ponds threatening an overflow. (Id. at P150). The EPA then directed the removal of the Gato Ponds. (See id. at P169-P170).
IV. GOVERNMENT'S CLEANUP COSTS.
Following the January 5, 2008, Davis Facility spill, the EPA and the United States Coast Guard ("Coast Guard") incurred $423,616.09 in removal costs while overseeing defendant's spill response. (See Dkt. 252-2, SUF at P162). The EPA and Coast Guard incurred $1,802,436.17 in oversight and removal costs following the January 29, 2008, Bell Facility spill. (See id. at P164). In April 2008, the EPA took over the removal action because defendant continued to utilize a contractor who did not possess the necessary health and safety training to perform hazardous waste cleanup. (See id. at P165). The EPA incurred $5,763.35 in removal costs while directing, monitoring and evaluating defendant's removal of the tank farm at the Williams B Facility. (See id. at P167). The EPA and Coast Guard incurred $50,538.92 in removal costs in directing, monitoring and evaluating defendant's removal of the Gato Ponds. (See id. at P169).
Following the December 27, 2008, Bell Facility spill, the EPA and the Coast Guard incurred $192,656.07 in removal costs. (See Dkt. 252-2, SUF at P171). In addition, the EPA incurred another $11,871.17 in removal costs after the December 21, 2010, Bell Facility spill. (See id. at P173). In total, the Coast Guard's National Pollution Funds Center paid removal costs totaling $2,486,881.77 out of the Oil Spill Liability Trust Fund. (See id. at P174). Defendant has not reimbursed the Oil Spill Liability Trust Fund for any removal costs associated with these spills and removal actions. (See id. at P173-P186).
LEGAL STANDARD
Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standard *1055 for granting a motion for summary judgment is essentially the same as for granting a directed verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.
The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).
If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553 ; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[5] A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. See SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552 ; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).
In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party. See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992). However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.
DISCUSSION
I. NAVIGABLE WATERS.[6]
Defendant does not contest the government's assertion that each of the 12 spills *1056 constituted a "discharge" of "oil" under § 311 of the CWA or that the 12 spills involved a pollutant from a "point source" under § 301 of the CWA. (See Dkt. 252-1, Jt. Br. at 5-7 (indicating defendant would omit argument "where, for purposes of this motion, it does not dispute the United States' contentions" and omitting argument with respect to "Discharge" and "Oil"); id. at 49-50 (no argument in response to the government's assertion that each spill was in "such quantities as may be harmful" under the CWA); id. at 38-41 (only challenging the navigable waters element of liability under § 301) ). Instead, defendant claims it cannot be held liable under §§ 311(b)(3) and 301(a) of the CWA or § 1002(a) of the OPA because Palmer Road Creek, Cat Canyon Creek, Sisquoc Creek, Spring Canyon Tributary and Zaca Tributary are not navigable waters within the meaning of the CWA.[7] (See id. at 2-3, 5, 7 & 41-42).
A. Liability Under the Clean Water Act and the Oil Pollution Act.
Under § 311(b)(3) of the CWA, "[t]he discharge of oil or hazardous substances [ ] into or upon the navigable waters of the United States, adjoining shorelines, ... in such quantities as may be harmful ... is prohibited[.]" 33 U.S.C. § 1321(b)(3). "Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged ... shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged." 33 U.S.C. § 1321(b)(7). Additionally, under § 301(a) of the CWA, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a) ; see Comm. to Save Mokelumne River v. East Bay Mun. Utility Dist., 13 F.3d 305, 309 (9th Cir. 1993), cert. denied, 513 U.S. 873, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994) ("the Act categorically prohibits any discharge of a pollutant from a point source without a permit."). "Liability for a violation of the Clean Water Act is strict, i.e., there is no de minimis defense." Puget Soundkeeper Alliance v. Cruise Terminals of Am., LLC, 216 F.Supp.3d 1198, 1205 (W.D. Wash. 2015). Finally, pursuant to § 1002(a) of the OPA, 33 U.S.C. § 2702, the "responsible party" of "a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that result from such incident."
B. Navigable Waters Following the Supreme Court's Decision in Rapanos.
As the Ninth Circuit has summarized, in Rapanos v. United States, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), "a 4-4-1 plurality opinion, the Supreme Court addressed how the term 'navigable waters' should be construed under the [Clean Water] Act. The plurality, written by Justice Scalia for four Justices, would have reversed on the grounds that only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' are protected under the CWA." N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 999 (9th Cir. 2007), cert. denied, 552 U.S. 1180, 128 S.Ct. 1225, 170 L.Ed.2d 61 (2008). However, *1057 "Justice Kennedy, constituting the fifth vote for reversal, concurred only in the judgment" and explained "that when wetlands are isolated, or adjacent only to a non-navigable tributary of a navigable waterway, those wetlands are regulable under the CWA only if there is a significant nexus between the wetlands at issue and the navigable waterway. He explained that a significant nexus exists 'if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.' " Id. at 1000 (quoting Rapanos, 547 U.S. at 779-80, 126 S.Ct. at 2248 ).
In City of Healdsburg, the Ninth Circuit held that Justice Kennedy's concurring opinion "is the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases ... [and] provides the controlling rule of law for our case." 496 F.3d at 999. Later in N. Cal. River Watch v. Wilcox, 633 F.3d 766, 781 (9th Cir. 2011), the Ninth Circuit stated that City of Healdsburg"did not, however, foreclose the argument that Clean Water Act jurisdiction may also be established under the plurality's standard."
In United States v. Moses, 496 F.3d 984 (9th Cir. 2007), cert. denied, 554 U.S. 918, 128 S.Ct. 2963, 171 L.Ed.2d 886 (2008), the court concluded that in Rapanos"the Supreme Court unanimously agreed that intermittent streams (at least those that are seasonal) can be waters of the United States." Id. at 986. More recently, in United States v. Robertson, 875 F.3d 1281 (9th Cir. 2017), the court rejected the same argument defendant raises here, (see Dkt. 252-1, Jt. Br. at 12-17), i.e., that City of Healdsburg is no longer good law in light of United States v. Davis, 825 F.3d 1014, 1021-22 (9th Cir. 2016) (en banc ). In Robertson, the defendant was convicted of discharging dredged and fill material into surrounding wetlands and an adjacent tributary without a permit. Id. at 1286. The defendant argued that, as a result of Davis,[8] Justice Kennedy's concurrence and the significant nexus test was no longer controlling law in the Ninth Circuit for determining CWA jurisdiction. See id. at 1290. The Robertson court rejected the assertion that City of Healdsburg cannot be reconciled with Davis, reiterating that " City of Healdsburg remains valid and binding precedent." Id. at 1292 ; see id. at 1293 ( Davis does not undermine the continuing validity of City of Healdsburg for purposes of jurisdiction."). Accordingly, the court will apply Justice Kennedy's significant nexus test in determining whether the tributaries at issue are navigable waters within the meaning of the CWA. See id.; City of Healdsburg, 496 F.3d at 999.
C. The Significant Nexus Requirement.
Under Justice Kennedy's test in Rapanos, to be a water subject to regulation under the CWA, the water or wetland must possess a " 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." 547 U.S. at 759, 126 S.Ct. at 2236. Here, defendant describes the waters at issue as ephemeral drainages lacking a significant nexus to a TNW. (See Dkt. 252-1, Jt. Br. at 1-2).
*1058 Following Rapanos, courts have characterized Justice Kennedy's significant nexus test as a "flexible ecological inquiry[,]" Precon Development Corp., Inc. v. Army Corps of Engineers, 633 F.3d 278, 294 (4th Cir. 2011) (" Precon I"), and that "laboratory analysis of soil samples, water samples, or [ ] other tests" are not required to prove a significant nexus. United States v. Cundiff, 555 F.3d 200, 211 (6th Cir.), cert. denied, 558 U.S. 818, 130 S.Ct. 74, 175 L.Ed.2d 27 (2009) ; Precon Development Corp., Inc. v. Army Corps of Engineers, 603 Fed.Appx. 149, 151-52 (4th Cir. 2015) (" Precon II") (noting CWA jurisdiction may be supported by "[q]uantitative or qualitative evidence"). Indeed, a wide range of factors have been found to support the existence of a significant nexus to a TNW. See, e.g., Foster v. Environmental Protection Agency, 2017 WL 3485049, *13 (S.D.W.V. 2017) (noting that certain activities "[h]ave been recognized by courts as forming a significant nexus with a traditional navigable water" including "(1) contributing flow, sediment and other material to downstream waters; (2) supporting and exchanging aquatic life with downstream waters; and (3) processing nutrients, materials and pollutants."); Cundiff, 555 F.3d at 211 (district court did not err in finding that wetlands passed the significant nexus test where government expert "testified that the wetlands perform significant ecological functions in relation to the Green River and the two creeks, including: temporary and long-term water storage, filtering of the acid runoff and sediment from the nearby mine, and providing an important habitat for plants and wildlife."); United States v. Donovan, 661 F.3d 174, 186 (3d Cir. 2011) (research showing that wetlands contributed flow to downstream waters and "help[ed to remove nitrogen and protect the Delaware Estuary form excessive nutrient loading" supported existence of a significant nexus); Duarte Nursery, Inc. v. Army Corps of Engineers, 2016 WL 4717986, *17 (E.D. Cal. 2016) ("In addition, the United States' expert report provides that the dissolved and particulate organic carbon and dissolved nutrients on the Property are related to the Coyote Creek/Oak Creek system, which flows to the Sacramento River.").
Defendant advances several contentions regarding Rapanos and the significant nexus requirement claiming that: (1) the significant nexus test is inapplicable because Rapanos concerned wetlands and not tributaries; and (2) Justice Kennedy rejected the use of the existence of an ordinary high water mark ("OHWM")[9] to establish CWA jurisdiction. (See Dkt. 252-1, Jt. Br. at 11 & 18-20). Defendant's contentions are unpersuasive.
First, the court disagrees with defendant's assertion, (see Dkt. 252-1, Jt. Br. at 11), that the significant nexus test is inapplicable because Rapanos concerned only wetlands. While initially there was some uncertainty regarding whether the significant nexus test is applicable outside of the wetlands context, see, e.g., San Francisco Baykeeper v. Cargill Salt Div., 481 F.3d 700, 707 (9th Cir. 2007) (describing Justice Kennedy's concurrence as "controlling" but also stating, "[n]o Justice, even in dictum, addressed the question whether all waterbodies with a significant nexus to navigable waters are covered by the Act."), *1059 the Ninth Circuit has since extended the significant nexus test to tributaries. See, e.g., Robertson, 875 F.3d at 1293 ("Robertson was on notice from City of Healdsburg at the time of his excavation activities that wetlands and non-navigable tributaries are subject to CWA jurisdiction" if they have a significant nexus); id. at 1294 n. 4 (no error with jury instruction applying the significant nexus test to a tributary); Moses, 496 F.3d at 986 (observing that even though Rapanos"directly dealt with the reach of the CWA over wetlands," the court also "addressed itself to the question of what could be a tributary" and holding that an intermittent seasonal stream satisfied the significant nexus test); United States v. Vierstra, 492 Fed.Appx. 738 (9th Cir. 2012) (affirming and applying significant nexus test to a tributary).[10]
Next, defendant argues that the government may not rely on the existence of an OHWM to assert jurisdiction under the CWA because Justice Kennedy criticized the use of the OHWM standard in his concurrence. (See Dkt. 252-1, Jt. Br. at 18). This argument goes too far in characterizing Justice Kennedy's criticism of the OHWM standard. As the Ninth Circuit recently noted, "Justice Kennedy stated in Rapanos that the presence of an ordinary high water mark on a tributary could not be 'the determinative measure' of whether a wetland adjacent to that tributary is covered by the CWA, [but] he did not forbid the consideration of an ordinary high water mark." Robertson, 875 F.3d at 1295. Thus, the court will consider the existence of an OHWM as one factor in its significant nexus analysis.[11]
II. WHETHER THE WATERS AT ISSUE POSSESS A SIGNIFICANT NEXUS TO A TNW.[12]
A. Cat Canyon Creek, Palmer Road Creek and Zaca Tributary.
During the wet seasons from 2008-09 to 2015-16, the government's national *1060 wetland and river science and regulatory expert, Dr. Lyndon Lee, Ph.D. ("Dr. Lee") and his team "conducted field work activities including stream characterizations; surveys of channel beds, banks, and ordinary high water mark features; pebble counts to characterize sediments; and gauging of stream flows" in the Zaca Creek and Cat Canyon Creek ecosystems. (See Dkt. 252-3, Declaration of Dr. Lee [ ] ("Lee Decl.") at ECF 10136 & ¶¶ 1-2). Dr. Lee and his team also "deployed and regularly maintained automatic water level recorders ... beginning in the wet season of 2008-09 and continuing for the duration of the study." (Id. ). Dr. Lee used his own field observations, water recorder data, and "standard hydrologic data synthesis techniques to develop hydrologic models of water flows" for the Zaca Creek and Cat Canyon Creek watersheds. (See id. ).
Dr. Lee opines that Zaca Tributary is an intermittent seasonal stream with an OHWM. (See Dkt. 252-3, Expert Report of Dr. Lee ("Lee Report") at ECF 10177; Dkt. 252-3, Lee Decl. at ECF 10138 & ¶ 3; id. at ECF 10145 (photograph showing the OHWM at Zaca Tributary) ). Dr. Lee personally observed six hydrological connections between Zaca Tributary to the Santa Ynez Estuary between 2009 and 2012, and based on collected data, opines that there were at least five other occasions during the wet seasons between 2013 and 2016. (See Dkt. 252-3, Lee Decl. at ECF 10138 & ¶ 4; Lee Report at ECF 10198-99). In addition, during the wet seasons of 2009-2010 and 2010-2011, there was water flow at different points in Zaca Tributary ranging from 18 to 117 days. (See Dkt. 252-3, Lee Report at ECF 10196; Dkt. 252-8, Evidentiary Appendix ("Evid. Appx.") at ECF 10397) (for 2009-2010 water year, there was approximately 18.5 days of water flow in Zaca Tributary over 11 flow events); (id. at ECF 10405) (for 2010-2011 water year, total flow was approximately 17 days 13.3 hours over eight flow events); (id. at ECF 10408) (for 2011-2012 water year, there was 117 days 5.3 hours of flow over five flow events); (id. at ECF 10422) (for 2012-2013 water year, there was approximately four days 8.6 hours over 12 flow events); (id. at ECF 10430) (for 2013-2014 water year, total flow duration was one day 16.7 hours over three flow events); (id. at ECF 10438) (for 2014-2015 water year, total flow duration was three days 9.6 hours over seven flow events). On January 21, 2010, Dr. Lee measured significant water flow in Zaca Tributary equivalent to 3,366 gallons per minute which, over the course of an entire day, would amount to 4,847,040 gallons of water to the Santa Ynez Estuary. (See Dkt. 252-3, Lee Report at ECF 10197; Dkt. 252-8, Evid.
*1061 Appx. at ECF 10463) (in January 2010, flow duration of five days 11.5 hours and discharge of 17,615,757 gallons); (id. at ECF 10464) (between April 2011 and May 2011, flow duration of 47 days 13.25 hours and discharge of 228,380,170 gallons).
As for Palmer Road Creek, Dr. Lee opines that it is an intermittent tributary with an OHWM.[13] (See Dkt. 252-3, Lee Decl. at ECF 10140 & ¶ 13); id. at ECF 10151 (photograph of Palmer Road Creek showing the OHWM) ). For the period between December 2009 and April 2010, water flow was recorded approximately 34 days over nine flow events. (See Dkt. 252-8, Evid. Appx. at ECF 10395). In addition, on at least one occasion on February 26, 2010, there was a discharge of 2,781,562 gallons of water. (See id. at ECF 10396). For the 2010-2011 water year, water flow was recorded for approximately 26 days over four flow events. (See id. at ECF 10402). Discharge during the 2010-2011 water year included 13,314,915 gallons over one day 21.75 hours, 27,071,442 gallons over two days 20 hours, and 123,283,573 gallons over eight days 16.5 hours. (See id. at ECF 10404); (id. at ECF 10419) (for 2012-2013 water year, total flow duration was approximately six days 6.8 hours over eight flow events); (id. at ECF 10427) (for 2013-2014 water year, total flow duration was approximately 3.6 hours over a single flow event); (id. at ECF 10435) (for 2014-2015 water year, total flow duration was approximately 15.9 hours over two flow events); (id. at ECF 10443) (for 2015-2016 water year, total flow duration was approximately 16.8 hours over two flow events).
With respect to Cat Canyon Creek, Dr. Lee concludes that is an intermittent tributary with an OHWM. (See Dkt. 252-3, Lee Decl. at ECF 10140 & ¶ 14; id. at ECF 10161 (photograph showing OHWM for Cat Canyon Creek) ). During the 2010-2011 water year, water flow was recorded at Cat Canyon Creek for a duration of approximately 20 days 7.2 hours over six flow events. (See Dkt. 252-8, Evid. Appx. at ECF 10403). In 2011-2012, there was only flow for approximately 1.4 days over five flow events. (See id. at ECF 10412); (id. at ECF 10420) (for 2012-2013 water year, flow duration totaled approximately 3.5 hours over two flow events); (id. at ECF 10428) (for 2013-2014 water year, flow duration was approximately one day 10.6 hours over one flow event); (id. at ECF 10436) (for 2014-2015 water year, flow duration was approximately 12.4 hours over two flow events); (id. at ECF 10444) (for 2015-2016 water year, flow duration was approximately 12.4 hours over two flow events). In addition, Dr. Lee's study predicts peak flow of 84.57 cfs for a two-year 24-hour storm event. (See id. at ECF 10452).
*1062 In addition to possessing OHWMs and having documented hydrological connections and water flow, Dr. Lee opines that Zaca Tributary, Palmer Road Creek and Cat Canyon Creek significantly affect the physical, biological and chemical integrity of a downstream TNW. For example, with respect to the Zaca Tributary, Dr. Lee states that it "perform[s] a suite of functions that contribute to maintaining the integrity of ... the Santa Ynez Estuary" including "sediment mobilization, transport, and deposition, surface and groundwater storage and exchange, and surface water flow." (Dkt. 252-3, Lee Decl. at ECF 10139 & ¶ 9). In addition, Zaca Tributary performs physical and chemical functions such as "cycling and detention of elements and compounds, detention of particulates, and export of organic carbon" and performs plant community and faunal functions including "maintenance of the characteristic structure and diversity of the plant community, production and export of organic carbon, maintenance of the structure and complexity of faunal habitats, and production of food for a range of faunal species." (Id. ). With respect to physical or hydrological functions, Dr. Lee notes that Zaca Tributary's main functions are: (1) sediment mobilization, transport and deposition; (2) surface and groundwater storage and exchange; and (3) surface water flow. (See id., Lee Report at ECF 10205). In support of his conclusions, Dr. Lee relies on histograms of pebble counts he and his team collected that show "a consistent pattern of movement of sand, gravel, and cobble sized sediment ... via stormflows." (Id. ). Zaca Tributary also performs a variety of chemical functions such as: (1) cycling elements and compounds; (2) detention of imported elements and compounds; (3) detention of particulates; and (4) organic carbon export. (See id. ). According to Dr. Lee, Zaca Tributary serves significant biological functions by "provid[ing] horizontal and vertical structure and complexity that contributes food, cover, nesting and breeding habitat, and migration routes for fauna in the ecosystem." (Id. at ECF 10206). Dr. Lee concludes "that taken alone, the contribution of ecosystem functions and services of Zaca Tributary to the downstream chemical, physical, and biological integrity and functioning of the Santa Ynez Estuary is significant. If discharges of pollutants such as heavy concentrations of nitrogen, herbicides and pesticides, and heavy metals associated with untreated storm water runoff were introduced into Zaca Tributary," pollutants could reach the Santa Ynez Estuary in a matter of hours or one to two days.[14] (Id. at ECF 10208); see also Orchard Hill Building Co. v. Army Corps of Engineers, 2017 WL 4150728, *6 (N.D. Ill. 2017) ("It is evident that any pollutant or fill material that degrades water quality in a tributary of navigable waters has the potential to move downstream and degrade the quality of the navigable waters themselves.). Dr. Lee draws similar conclusions regarding Cat Canyon Creek and Palmer Road Creek. (See Dkt. 252-3, Lee Report at ECF 10220-21).
Defendant's expert, Michael Josselyn, Ph.D. ("Dr. Josselyn"), takes issue with several aspects of Dr. Lee's analysis and conclusions, claiming that: (1) all the waters are dry most of the year and each contributes less than one percent of the total water amount to their respective nearest TNW, (see Dkt. 252-12, Declaration of Dr. Josselyn ("Josselyn Decl.") at ¶¶ 4-12); (2) instead of relying on site-specific data, Dr. Lee "relies on general *1063 principles ... and assumptions from factually inapposite studies" to claim that the waters significantly affect the chemical, physical and biological integrity of a downstream TNW, (id. at ¶¶ 13-22); (3) Dr. Lee relies on the cumulative effects of other similarly situated tributaries to reach his conclusions, (see id. at ¶¶ 23-27); and (4) Dr. Lee improperly concludes that the waters are "intermittent" when they should be classified as "ephemeral" under the Army Corps of Engineers' ("Corps") own definitions. (See id. at ¶¶ 28-29). According to Dr. Josselyn, none of the waters at issue have a significant nexus to a TNW.[15] (See id. at ECF 10877; Dkt. 252-12, Expert Opinion Report by Michael Josselyn, Ph.D. ("Josselyn Report") at 10891).
Having carefully reviewed the expert reports submitted by the parties, the court is not persuaded that Dr. Josselyn's report creates any triable issues as to whether Palmer Road Creek,[16] Cat Canyon Creek and Zaca Tributary significantly affect the physical, biological and chemical integrity of a downstream TNW.[17] The court first turns to defendant's contention that Cat Canyon Creek, Palmer Road Creek and Zaca Tributary are nothing more than "drainages" which are dry most of the year and located many miles from the nearest TNW. (See Dkt. 252-1, Jt. Br. at 22-23; Dkt. 252-12, Josselyn Decl. at ¶¶ 4-12). Defendant asserts that none of the waters at issue are jurisdictional because they have insignificant flow and contribute less than one percent of the water to their nearest respective TNW. (See Dkt. 252-1, Jt. Br. at 22-3). However, defendant does not offer any authority suggesting that the amount of flow to the nearest TNW is determinative. (See, generally, id. ). Defendant's position would, in effect, "destroy [CWA] jurisdiction through 'death by a thousand cuts.' " Precon II, 603 Fed.Appx. at 152 (rejecting argument that wetlands lacked a significant nexus "because the 448-acre wetlands make up a small percentage of the Northwest River watershed") (internal quotation marks omitted). Defendant also points out that the waters are "tens of miles from the nearest" TNW, (see Dkt. 252-1, Jt. Br. at 3), but again, defendant cites no authority suggesting that such a distance precludes the existence of CWA jurisdiction or studies showing that waters beyond a certain distance cannot significantly affect a downstream *1064 TNW. (See, generally, id. ); see, e.g., Cal. Sportfishing, 124 F.Supp.3d at 1018 (concluding that a ravine which flows into a creek and then into a river located 19 miles downstream from the facility at issue sufficient to confer jurisdiction under the CWA).
Dr. Josselyn claims that Cat Canyon Creek, Palmer Road Creek and Zaca Tributary are ephemeral streams, which are streams with "flowing water only during, and for a short duration after, precipitation events in a typical year[,]" (see Dkt. 252-12, Josselyn Report at ECF 10952-53), and that the government's data shows that water typically flows only following rain events. (See Dkt. 252-12, Josselyn Decl. at ¶¶ 28-29). However, even if true, the Army Corps of Engineers Jurisdictional Determination Form Instructional Guidebook ("Guidebook"), which defendant itself cites, (see Dkt. 252-1, Jt. Br. at 18-19), contemplates that "[c]ertain ephemeral waters in the arid west are distinguishable from the geographic features described below where such ephemeral waters are tributaries and may have a significant nexus to TNWs."[18] (See Dkt. 252-14, Evid. Appx., Guidebook at ECF 11146). The Guidebook notes that even an "unnamed ephemeral tributary" may be jurisdictional under the CWA so long as it has a significant nexus with a TNW. (See id. at ECF 11153-55). The Guidebook is consistent with Justice Kennedy's concurrence, where he took issue with the plurality's requirement of standing water or continuous flow for at least "some months" as ignoring the nature of waters "in the western parts of the Nation" and "mak[ing] little practical sense in a statute concerned with downstream water quality[.]" See Rapanos, 547 U.S. at 779, 126 S.Ct. at 2242 (Kennedy, J., concurring in judgment). Thus, even ephemeral streams may be jurisdictional under the CWA so long as they possess a significant nexus to a TNW.
As for the existence of a significant nexus, Dr. Josselyn opines that the "flow generated from these sites is very infrequent and unlikely to have a significant effect on the downstream navigable water" and that in some instances, the large amount of flow that Dr. Lee recorded was the result of human intervention.[19] (See Dkt. 252-12, *1065 Josselyn Report at ECF 10905). He explains that none of the facilities at issue "are located directly on any feature with an [OHWM] and most are hundreds of feet and up to 0.4 miles from a feature with an [OHWM]."[20] (Dkt. 252-12, Josselyn Report at ECF 10904). However, Dr. Josselyn's analysis does not examine whether the waters significantly affect the chemical, physical, or biological integrity of a TNW even though Justice Kennedy's significant nexus calls for such analysis. (See, generally, Dkt. 252-12, Josselyn Report at ECF 10900) (explaining that in his significant nexus determination, Dr. Josselyn considered: (1) the presence of an OHWM; (2) the volume of flow; and (3) proximity to navigable waters); see also Rapanos, 547 U.S. at 779-80, 126 S.Ct. at 2248 ("[I]f the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' ").
Instead, Dr. Josselyn criticizes Dr. Lee's significant nexus analysis as being based only on "generalized theories" without any "site-specific ecological data[.]" (See Dkt. 252-1, Jt. Br. at 31-32; Dkt. 252-12, Josselyn Decl. at ECF 10959-60 & ¶¶ 13-22). To the contrary, Dr. Lee and his team performed site-specific studies in the Zaca Creek and Cat Canyon Creek watersheds and performed field work on multiple occasions between 2008 and 2016. (See Dkt. 252-3, Dr. Lee Report at ECF 10190). For instance, between December 2008 and April 2009, Dr. Lee and his team collected measurements, "pebble counts, characterization of dominant vegetation, photographs, and flow estimates."[21] (See Dkt. 252-3, Dr. Lee Report at ECF 10190). Also, for the wet seasons between the fall of 2009 and spring of 2016, Dr. Lee and his team "conducted periodic field observations of stream conditions" and "regularly traveled downstream along the length of each stream system ... and then downstream along the rivers to the estuaries of *1066 the Santa Ynez and Santa Maria Rivers[.]" (Id. at ECF 10191). During these visits, he collected data from instruments and "took photographs of stream conditions, faunal species using stream systems, runoff events, and instruments." (Id. ). Dr. Lee also cites a soil map that was created by the United States Natural Resources Conservation Service that sets forth the types of soils found within the Zaca Creek and Cat Canyon Creek watersheds, (see id. at ECF 10186), and pebble counts from Zaca Tributary to show that there are "large inputs of very fine sediment throughout the channel system." (Id. at ECF 10204).
While it is true that Dr. Lee's report cites general studies and relies on data collected by others, defendant does not offer any authority as to why Dr. Lee, or any expert for that matter, cannot rely on general principles and studies performed by others to reach his conclusions. (See, generally, Dkt. 252-1, Jt. Br.); see United States v. Roberts, 830 F.Supp.2d 372, 383 (M.D. Tenn. 2011) ("To be sure, in formulating his opinion, Martin relied not just upon his own site visit, but also upon such things as topographical maps, statistical modeling, a stream survey and habitat assessment form, and the MACTEC report, all of which were prepared by others. However, experts may rely on data from others, at least to the extent that the data is of the type reasonably relied on by other experts in the field.") (footnote omitted).[22] Nor does defendant cite any case suggesting that every piece of data, report or literature the government relies upon for the significant nexus analysis must be site-specific. (See, generally, Dkt. 252-1, Jt. Br.). Even assuming, as Dr. Josselyn claims, (see Dkt. 252-12, Josselyn Rebuttal Report at ECF 10958-60), that Dr. Lee relied on certain studies related to ecosystems located in other countries, (see id. ); see e.g. Dkt. 252-3, Dr. Lee Report at ECF 10205-08), Dr. Lee also cites to literature specifically pertaining to "the Central and Southern Coast Regions of California," (see Dkt. 252-3, Lee Report at ECF 10204), as well as many other studies Dr. Josselyn fails to address. (See, e.g., Dkt. 252-3, Lee Report at ECF 10205) (referencing four reports only one of which Dr. Josselyn addresses). Finally, the court notes that some of Dr. Josselyn's criticisms of Dr. Lee's analysis are not supported by any authority or literature in the relevant field. (See, generally, Dkt. 252-12, Josselyn Rebuttal Report at ECF 10959).
In essence, defendant is suggesting that the EPA is required to provide specific types of data and perform particular sets of tests to show a significant nexus. But the significant nexus test does not require "laboratory analysis of soil samples, water samples, or ... other tests." Cundiff, 555 F.3d 200 ; see Precon I, 633 F.3d at 293 ("We agree that the significant nexus test *1067 does not require laboratory tests or any particular quantitative measurements in order to establish significance."); see, e.g., Precon II, 603 Fed.Appx. at 152 (rejecting expert opinion which "framed significance as something approaching statistical significance" as "set[ting] the bar too high, as purely qualitative evidence may satisfy the significant nexus test."); Wisconsin Resources Protection Council, Center for Biological Diversity v. Flambeau Min. Co., 903 F.Supp.2d 690, 715 (W.D. Wis. 2012) (rejecting contention that the significant nexus test requires "sufficient data regarding stream flow, duration or a measurable impact of the copper and zinc ... on the water quality of [a TNW]"). Defendant's attempt to dispute Dr. Lee's extensive and detailed report and analysis fails to create a triable issue of fact as to whether Cat Canyon Creek, Palmer Road Creek and Zaca Tributary: (1) have hydrologic connections to a TNW; (2) have both documented and potential significant water flow and duration; and (3) significantly affect the physical, chemical and biological integrity of a downstream TNW. In short, the court concludes that Cat Canyon Creek, Palmer Road Creek and Zaca Tributary have a significant nexus to a TNW and are therefore jurisdictional under the CWA. See, e.g., Cundiff, 555 F.3d at 211 (district court did not err in crediting the government's expert's testimony that the wetlands at issue "perform significant ecological functions in relation to the Green River and the two creeks, including: temporary and long-term water storage, filtering of the acid runoff and sediment from the nearby mine, and providing an important habitat for plants and wildlife"); Environmental Protection Info. Ctr. v. Pac. Lumber Co., 469 F.Supp.2d 803, 823 (N.D. Cal. 2007) ("PALCO has offered only assertions as to the maps' unreliability but has not offered facts to demonstrate that the maps indicated a connection between any of the streams in question and Bear Creek which did not in fact exist.... PALCO has not put forth specific facts to rebut EPIC's showing and create a genuine factual dispute as to the hydrologic connection between the streams and Bear Creek."); Cal. Sportfishing v. Chico Scrap Metal, Inc., 124 F.Supp.3d 1007, 1017-18 (E.D. Cal. 2015) ("If other bodies of water are conduits for the Facility's discharges to seep into the navigable [Feather River], and the Facility's discharges significantly affect the physical, biological, and chemical integrity of the [Feather] River, then the Facility's discharges are subject to the CWA.) (internal quotation marks omitted); Duarte, 2016 WL 4717986, at *17 ("In addition, the United States' expert report provides that the dissolved and particulate organic carbon and dissolved nutrients on the Property are related to the Coyote Creek/Oak Creek system, which flows to the Sacramento River. Plaintiffs do not point to any specific facts showing that there is a genuine issue for trial. The court thus finds that the wetlands on the Property have a 'significant nexus' with the Sacramento River, which is a traditionally navigable waterway.") (internal quotation marks omitted); Precon Development Corp., Inc. v. Army Corps of Engineers, 984 F.Supp.2d 538, 562 (E.D. Va. 2013) ("This evidence establishes that the wetlands, based on their biological and ecological function, have impact on the water that goes through it, and that water ends up in the Northwest River. The evidence to support this is found in maps, pictures, testimony of witnesses, expert testimony, soil testing, expert testing, and scientific literature."); Orchard Hill, 2017 WL 4150728, at *6 ("The Corps' empirical scientific findings conclude that the thirteen acres of wetlands on the Warmke Parcel significantly affect the physical, chemical, and biological integrity of the Little Calumet River, and thus establish the requisite *1068 significant nexus to that traditional navigable water.").
B. Sisquoc Creek and Spring Canyon Tributary.
Defendant also argues that Sisquoc Creek and Spring Canyon Tributary are not navigable waters. (See Dkt. 252-1, Jt. Br. at 46-47). Viewing the evidence in the light most favorable to defendant, see Barlow, 943 F.2d at 1134, the court finds that triable issues of fact exist as to whether Sisquoc Creek and Spring Canyon Tributary have a significant nexus to a TNW.
Neither Dr. Lee nor Dr. Josselyn provide any specific data concerning Sisquoc Creek in their reports. (See, generally, Dkt. 252-3, Lee Report; Dkt. 252-12, Josselyn Report). Although Palmer Road Creek flows into Sisquoc Creek, (see Dkt. 252-4, Evid. Appx. at ECF 10290) (map showing stream orders of Cat Canyon Creek watershed), the government did not provide any specific evidence regarding Sisquoc Creek. Thus, the court is unable to determine at this time whether Sisquoc Creek has a significant nexus to a TNW.
As for the Spring Canyon Tributary, the government similarly relies on Dr. Lee's declaration and report to demonstrate that Spring Canyon Tributary has a significant nexus to a TNW. (See Dkt. 252-2, SUF at P70). The government claims that oil spills from the Bell Facility on December 27, 2008, and May 1, 2009, reached Spring Canyon Tributary. (See Dkt. 252-1, Jt. Br. at 24; Dkt. 252-2, SUF at P51-P52). Dr. Lee personally observed six complete hydrologic connections from Palmer Road Creek and Spring Canyon Tributary to the Santa Maria Estuary during wet seasons between 2009 and 2012. (See Dkt. 252-3, Lee Decl. at ¶ 16). According to Dr. Lee, "[b]ased on precipitation data, water level recorder data, and hydrologic modeling, [he] can conclude with a high degree of certainty that complete hydrologic connections from Palmer Road Creek and from Spring Canyon Tributary to the Santa Maria Estuary occurred on at least four occasions during the wet season of 2013-2014, 2014-2015, and 2015-2016." (Id. ). Yet, unlike his analysis regarding Cat Canyon Creek, Palmer Road Creek and Zaca Tributary, it does not appear that Dr. Lee collected any specific flow or volume data from Spring Canyon Tributary. (See, generally, Dkt. 252-7, Evid. Appx., Hydrology Analyses at ECF 10349-10366) (no analysis for Spring Canyon Tributary); (id. at ECF 10389) (showing that no water level loggers were placed in Spring Canyon Tributary). While the court recognizes that no specific types of tests are required to establish the existence of a significant nexus, see Precon I, 633 F.3d at 294 ; Cundiff, 555 F.3d at 211, "Justice Kennedy explained that a mere hydrologic connection should not suffice in all cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." City of Healdsburg, 496 F.3d at 1000 (internal quotation marks omitted). In short, the court finds that a triable issue remains as to whether Spring Canyon Tributary is jurisdictional under the CWA.
III. LIABILITY UNDER § 1002(A) OF THE OPA.
The government also moves for summary judgment with respect to liability for six spills under the OPA: (1) the January 29, 2008, December 27, 2008, and December 21, 2010, spills at the Bell Facility; (2) the January 5, 2008, spill at the Davis Facility; (3) the "substantial threat of a discharge of oil" at the Williams B Facility in March 2008; and (4) the substantial threat of a discharge of oil from the Gato Ponds at the Bell Facility in April 2008. (See Dkt. 252-1, Jt. Br. at 41). Defendant asserts the EPA's actions were arbitrary *1069 and capricious, claiming that government officials involved in the cleanup process incurred unnecessary and excessive cleanup costs. (See id. at 44-45). In addition, defendant claims it cannot be held liable for the January 5, 2008, spill because it was caused by the malicious act of an unknown third party. (See id. at 42).
A. Legal Standard.
"When reviewing agency decisions under the APA, a court may only set aside a final agency decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial evidence.' " Kim v. Baran, 2014 WL 12573361, *2 (C.D. Cal. 2014) (quoting 5 U.S.C. § 706 ). An agency decision is "arbitrary and capricious" when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Beno v. Shalala, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting Motor Vehicle Mfr. Ass'n v. State Farm Ins., 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) ). Under this "narrow" standard of review, the court "is not to substitute its judgment for that of the agency," and the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned[.]" F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513-14, 129 S.Ct. 1800, 1810, 173 L.Ed.2d 738 (2009). An agency does not violate the arbitrary and capricious standard where it articulates "a rational relationship between its factual findings and its decision[.]" Fence Creek Cattle Co. v. United States Forest Service, 602 F.3d 1125, 1132 (9th Cir. 2010).
"In a case involving review of a final agency action under the [APA] ... the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." Sierra Club v. Mainella, 459 F.Supp.2d 76, 89 (D.D.C. 2006). "Th[e] court is not required to resolve any facts in a review of an administrative proceeding." Occidental Engineering Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985) ; see Northwest Motorcycle Ass'n v. United States Dept. of Agric., 18 F.3d 1468, 1472 (9th Cir. 1994) (the resolution of a summary judgment motion in an APA case "does not require fact finding" because "the court's review is limited to the administrative record"). An agency's factual findings are reviewed under the "extremely deferential" "substantial evidence" standard, which requires the court to "uphold the [agency]'s findings unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." Monjaraz-Munoz v. I.N.S., 327 F.3d 892, 895 (9th Cir.), amended by, 339 F.3d 1012 (2003) (emphasis in original). "[W]hile formal findings are not required, the record must be sufficient to support the agency action, show that the agency has considered the relevant factors, and enable the court to review the agency's decision." Beno, 30 F.3d at 1074.
B. Removal Costs under the OPA.
"The Clean Water Act § 311, as amended by the Oil Pollution Act of 1990, focuses on the prevention of and response to oil spills[,]" Native Village of Point Hope v. Salazar, 680 F.3d 1123, 1127 (9th Cir. 2012), "provides a framework for preventing and responding to potential oil spills" and "mandates oil spill contingency planning at four levels: the national, regional, and area levels, and, lastly, at the level of individual owners and operators of offshore oil facilities."
*1070 Alaska Wilderness League v. Jewell, 788 F.3d 1212, 1215 (9th Cir. 2015) (citing 33 U.S.C. § 1321(b) ); see Unocal Corp. v. United States, 222 F.3d 528, 535 (9th Cir. 2000) ("The purpose of OPA, as well as other remedial legislation passed by Congress and the states to address environmental disasters such as oil spills, was to encourage rapid private party responses."); Water Quality Ins. Syndicate v. United States, 225 F.Supp.3d 41, 48 (D.D.C. 2016) ("The OPA was designed to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry.") (internal quotation marks omitted). On the national level, the President is responsible for preparing a National Contingency Plan ("NCP") that sets forth "efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges." Jewell, 788 F.3d at 1215. "The NCP is ... applicable to response actions taken pursuant to CERCLA and the CWA."[23] United States v. Iron Mountain Mines, 724 F.Supp.2d 1086, 1091 (E.D. Cal. 2010) (citation omitted).
Under 33 U.S.C. § 2702, the "responsible party" of "a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) that result from such incident."[24] The OPA makes "parties responsible for oils spills [ ] strictly liable without regard to fault" for oil discharges. Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1052 (9th Cir. 2003). "To demonstrate that a party is strictly liable, the government must prove that (1) the defendant is a 'responsible party' (2) for the 'facility' or 'vessel' (3) from which oil was discharged, or from which there was a substantial threat of discharge, (4) "into or upon the navigable waters or adjoining shorelines" and (5) that the discharge resulted in 'removal costs and damages.' " Viking Resources, Inc., 607 F.Supp.2d at 815 (quoting 33 U.S.C. § 2702(a) ).
"Pursuant to the Clean Water Act ...and the [NCP] ... the Federal On-Scene Coordinator ... [is] in charge of the response, including the direction of all Federal, State, and private actors." Winkler v. BP Exploration & Prod., Inc., 205 F.Supp.3d 820, 822 (E.D. La. 2016). The On-Scene Coordinator ("OSC") "shall determine whether a discharge results in a substantial threat to public health or welfare of the United States (including, but not limited to, fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States)." 40 C.F.R. § 300.322(a). In making this determination, the OSC considers, but is not limited to, "the size of the discharge, the character of the discharge, and the nature of the threat to public health or welfare of the United States" and "[u]pon obtaining such information, the OSC shall conduct an evaluation of the threat posed, based on the OSC's experience in assessing other discharges, and consultation with senior lead agency officials and readily available authorities on issues outside the OSC's technical expertise."
*1071 Id.; see also BP America Inc. v. Chustz, 33 F.Supp.3d 676, 682 (M.D. La. 2014) (discussing requirements of the CWA).
In the aftermath of the January 29, 2008, Bell Facility spill, the EPA and Coast Guard incurred $1,802,436.17 in removal costs. (See Dkt. 252-2, SUF at P164). Defendant suggests that a large portion of these costs stemmed from OSC Robert Wise's ("Wise") decision to order removal of the tanks at the Williams B Facility and the Bell Facility's Gato Ponds[25] without first performing a structural analysis or conducting any studies to determine whether there were any alternative remedies available. (See Dkt. 252-1, Jt. Br. at 58-59; Dkt. 264, Def.'s Suppl. Br. at 12). Defendant denies that these structures represented a "substantial threat of a discharge of oil" within the meaning of 33 U.S.C. § 2702. (See Dkt. 252-1, Jt. Br. at 58-59).
As an initial matter, the court is unpersuaded by defendant's claim that the government is obligated to pursue "cost-effective" recovery costs under the OPA.[26] (See Dkt. 264, Def.'s Suppl. Br. at 11). To the contrary, "the OPA does not restrict the recovery of the United States to costs that were prudent, or necessary, or reasonable." United States v. Hyundai Merchant Marine Co., Ltd., 172 F.3d 1187, 1191 (9th Cir. 1999) ; see United States v. English, 2001 WL 940946, *1 (D. Haw. 2001) ("Under OPA, recovery of costs by the United States is not limited to those costs which are necessary or reasonable."); United States v. Jones, 267 F.Supp.2d 1349, 1363 (M.D. Ga. 2003) (noting that unlike CERCLA, the OPA allows the government to sue to recover all removal costs). Still, the government's "[r]ecovery under the OPA is not wholly unlimited" as "the general standard of the Administrative Procedure Act applies to its actions in seeking to prevent or contain an oil-spill disaster: the United States may recover its costs unless its actions were arbitrary or capricious." Id.; see *1072 Jones, 267 F.Supp.2d at 1363 (noting that EPA removal actions are subject to judicial review under the APA).
According to Wise, on March 12, 2008, he visited the tank farm at the Williams B Facility where he "observed that the tanks were corroded and actively leaking[,]" "the ground around the tanks was heavily saturated with oil and there was no system for secondary containment[,]" and the "tank farm was bordered by a wash that drained into Cat Canyon Creek." (Dkt. 252-11, Evid. Appx., Wise Decl. at ¶ 18). Based on these observations, he "determined the tank farm posed a substantial threat of discharge" and ordered defendant to "remove crude oil, sludge, and produced water from the tanks; demolish the tanks; and remove and remediate contaminated soil around the tank farm." (Id. at ¶¶ 18-19).
Instead of presenting evidence calling into question Wise's conclusions regarding the tank farm at the Williams B Facility, defendant asks the court to consider certain statements attributed to government employees as substantial evidence that the agencies acted in bad faith and "incurred unnecessary removal costs to punish" defendant.[27] (Dkt. 264, Def.'s Suppl. Br. at 11-13). A court's review "of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2005) ; see Water Quality Ins. Syndicate v. United States, 522 F.Supp.2d 220, 227-28 (D.D.C. 2007) (under the APA, the court only examines "the reasons articulated in the agency decision itself"). In addition, denying the reasonableness of the government's removal costs is generally insufficient. See In re Settoon Towing LLC, 722 F.Supp.2d 706, 710 (E.D. La. 2009) (defendant could not simply deny that the government's removal costs were necessary or reasonable to defeat summary judgment as "[s]uch denial, without supporting evidence, is insufficient to carry [defendant's] burden of showing that the United States' removal costs were arbitrary or capricious."). Indeed, "[t]here must be a strong showing of bad faith or improper behavior before the court may inquire into the thought processes of administrative decisionmakers." Animal Defense Council v. Hodel, 840 F.2d 1432, 1437 (9th Cir. 1988).
Here, even considering the statements, i.e., evidence outside the administrative record, defendant has not demonstrated how the EPA acted in bad faith. See Animal Defense Council, 840 F.2d at 1437 ("district court properly limited review to the administrative record" when there was no indication that the agency acted in bad faith based on the administrative record). Defendant has not proffered any evidence supporting its contention that the costs the EPA incurred were excessive or that the tank farm at the Williams B Facility did not represent a substantial threat of discharge. (See, generally, Dkt. 252-1, Jt. Br.; Dkt. 252-2, SUF; Dkt. 264, Def.'s Suppl. Br. at 11-12). The EPA concluded that the tanks posed a substantial threat of discharge following site visits in which the EPA found that: (1) all the tanks were "actively leaking in multiple places[;]" (2) the ground surrounding six above ground storage tanks was "heavily saturated with oil;" and (3) the tanks were full of holes, heavily corroded and missing man hole *1073 covers with some tanks missing tops. (See Dkt. 252-13, Evid. Appx. at ECF 11018) (EPA Pollution Report dated August 26, 2008, concerning the "Greka Williams B Lease"). Photographic evidence shows that the tanks were badly rusted, had large holes and damaged roofs, and were actively leaking oil. (See id. at ECF 11045-53). Significantly, defendant does not contest the EPA's observations of the tank farm's dilapidated condition. (See, generally, Dkt. 252-2, SUF at P143-146).
Defendant challenges Wise's decision not to conduct a structural analysis or to consider cheaper alternatives before ordering the removal of the tanks, (see Dkt. 264-7, Def.'s Suppl. Br. at ECF 11611-62 & 11614), but provides no authority for such a requirement.[28] (See, generally, id. ). Indeed, such a requirement appears to be contrary to the NCP's emphasis on prompt action. See 40 C.F.R. § 300.317 ("The OSC should not delay containment and removal decisions unnecessarily and should take actions to minimize adverse impact to the environment that begins as soon as a discharge occurs, as well as actions to minimize further adverse environmental impact from additional discharges."). In short, there is no basis to conclude that the EPA's decision was inconsistent with the NCP.[29] See California ex rel. California Dep't of Toxic Substances Control v. Neville Chem. Co., 358 F.3d 661, 673 (9th Cir. 2004) ("This change in policy and pursuit of the full costs of oversight cannot be 'inconsistent with' the national contingency plan, as the national contingency plan does not direct the state to limit its recovery of response costs in any way.").
Defendant has not presented any evidence to rebut the presumption that the EPA acted properly, see Pinnacle Armor, Inc. v. United States, 923 F.Supp.2d 1226, 1243 (E.D. Cal. 2013) (noting presumption that government agencies act properly and according to law), or otherwise "compel a reasonable finder of fact to reach a contrary result." Monjaraz-Munoz, 327 F.3d at 895. In other words, even if the court were to consider evidence outside the administrative record, the statements attributed to Wise or any other government *1074 employees are insufficient to create a triable issue as to whether the costs were actually excessive or whether the tank farm represented a substantial threat of discharge.[30] See, e.g., United States v. Kilroy & Assocs., Inc., 2009 WL 3633891, *5 (W.D. Wash. 2009) ("Given that Defendants have not submitted any material to the Court that would call into question the decision of the Coast Guard that the Vessel presented a 'substantial threat' of discharge, they have not carried their burden on this issue, and summary judgment is appropriate."); United States v. Am. Cyanamid, 786 F.Supp. 152, 161 (D. R.I. 1992) ("Even if a response action is shown to be inconsistent with the NCP, defendants still have not triumphed. In order to establish the amount of costs to be disallowed, 'the defendants have the burden of demonstrating that the clean-up, because of some variance from the Plan, resulted in demonstrable excess costs[.]"); Iron Mountain Mines, 724 F.Supp.2d at 1091 ("Defendants also have not offered evidence that the EPA acted in an arbitrary or capricious manner or that there were, 'specialists with conflicting views.' "). In short, the government is entitled to summary judgment with respect to defendant's liability for costs associated with the Williams B Facility removal action.
C. The OPA's Third-Party Defense.
Defendant claims it cannot be liable under the OPA for the January 5, 2008, Davis Facility spill because the spill was caused by the vandalism of an unknown third-party. (See Dkt. 252-1, Jt. Br. at 42 & 49-51). The court disagrees.
"The OPA imposes strict liability for pollution removal costs and damages on the 'responsible party' for a vessel or a facility from which oil is discharged." Complaint of Metlife Capital Corp., 132 F.3d 818, 820-21 (1st Cir. 1997) ; see United States v. Mizhir, 106 F.Supp.2d 124, 126 (D. Mass. 2000) ("Absent any defense, the OPA imposes strict liability upon the responsible party for oil removal costs."). The OPA does, however, permit "[t]hree complete defenses to strict liability ... [when] the discharge of oil was caused solely by (1) an act of God, (2) an act of war, or (3) an act or omission of a third party[.]" In re Petition of Frescati Shipping Co., Ltd., 2016 WL 4035994, *8 (E.D. Pa. 2016) (citing 33 U.S.C. § 2703(a) ). " Section 2703(a)(3) also requires a showing that the responsible party exercised due care with respect to the spilled oil and that it took precautions against the foreseeable acts or omissions of the third party to whom it is attempting to shift liability." Buffalo Marine Servs. Inc. v. United States, 663 F.3d 750, 752 (5th Cir. 2011).
The third-party defense under the OPA is "narrowly construed[.]"[31] Xiamen Ocean Shipping Co. v. United States, 2012 WL 12882375, *7 (D. Haw. 2012). A defendant must demonstrate that "the release or threatened release was caused solely by an unrelated third party."
*1075 United States v. A & N Cleaners & Launderers, Inc., 854 F.Supp. 229, 239 (S.D.N.Y. 1994) ; see Shore Realty Corp., 759 F.2d at 1044-45 & n. 17 ; United States v. Stringfellow, 661 F.Supp. 1053, 1061 (C.D. Cal.1987) (third-party defense applies "only where a totally unrelated third party is the sole cause of the release or threatened release of a hazardous substance"); O'Neil v. Picillo, 682 F.Supp. 706, 719 n. 2 (D.R.I. 1988) (third-party defenses under CERCLA "are very narrow defenses" and "essentially serve to shift the burden of the proof of causation to the defendants" which "encourages defendants to mark and dispose of their hazardous wastes with the greatest care; the defenses discourage defendants from carelessly allowing their wastes to run into one large, unidentifiable morass at the waste site, confident in the knowledge that the government must identify the wastes and prove causation").
Thomas Parker ("Parker"), a former FBI Agent, conducted an investigation of the spill on defendant's behalf and concluded there was strong evidence of vandalism. (See id. at 49-50). Based on Parker's investigation, defendant speculates that one of its former employees was responsible for the vandalism and "[h]ad the [former employee] not cut open the drain, the oil would not have escaped[.]" (See Dkt. 252-1, Jt. Br. at 51). However, defendant has already conceded that the January 5, 2008, spill was at least partly caused by the failure of an injection pump and the failure of a contracted third-party monitoring company to notify defendant of an alarm. (See Dkt. 252-2, SUF at P158-P162) (undisputed that a cause of the January 5, 2008, Davis Facility spill "was the failure of an injection pump motor" and also "the failure of an alarm company" with a contractual relationship with defendant to notify defendant of an alarm); Louisiana-Pacific Corp. v. ASARCO, Inc., 735 F.Supp. 358, 363 (W.D. Wash. 1990) ("Since USGI deposited its shot at B & L, and that act may have contributed to the contamination at B & L, even minimally, the defense is unavailable to USGI. The release or threat of release must have resulted solely by the act of a third party for USGI to succeed with this defense."). During his deposition, defendant's president Randeep Singh Grewal claimed the spill was caused by the failure of HVI's alarm company to call or inform HVI of the alarm. (See Dkt. 252-3, Deposition of Randeep Singh Grewal at ECF 10082); Dkt. 252-13, Evid. Appx. at ECF 11059 (investigative report into vandalism) ); Dkt. 252-3, Evid. Appx., at ECF 10054) ("The root cause of the release was the failure of an electrically powered injection pump motor due to a malfunction.") ("The alarm company received the alarm but failed to call the operator as required[.]"); id. at ECF 11231 ("a contributory cause of the release was the failure of the third party alarm company to notify [defendant] of the alarm signal indicating a high level in the Injection tank") ). Because defendant "cannot show that a third party was the 'sole' cause of the release[,] ... there is no need to discuss whether he exercised due care or took the proper precautions to prevent such a release." United States v. Honeywell Intern., Inc., 542 F.Supp.2d 1188, 1200 (E.D. Cal. 2008) ; see Coppola v. Smith, 2015 WL 224730, *7 (E.D. Cal. 2015) ("First, that defense only applies when a third party is the 'sole cause' of contamination. Here, there are multiple parties that allegedly contributed to the contamination. M & M must show that only one of these parties caused the PCE contamination, and M & M has not done so. Second, M & M has a contractual relationship with a responsible party (Millers Dry Cleaning) and thus, cannot assert the defense"); Kilroy, 2009 WL 3633891, at *7 ("Plaintiffs have demonstrated that there is nothing in the record that would create a genuine issue of fact as to whether the cause of the *1076 sinking was solely an act of a third party.").
Relying on Castaic Lake Water Agency v. Whittaker Corp., 272 F.Supp.2d 1053, 1082 (C.D. Cal. 2003), defendant claims that because it exercised due care and took reasonable precautions to protect against the vandalism, it is entitled to rely on the OPA's third-party defense. (See Dkt. 252-1, Jt. Br. at 51-52). In Castaic Lake, the court concluded that CERCLA's third-party defense incorporates the concept of proximate cause. 272 F.Supp.2d at 1082. Even accepting defendant's argument that it cannot be held liable for unforeseeable acts, defendant's own investigation belies any suggestion that the vandalism at defendant's facility was unforeseeable. Defendant's investigation documented at least six suspicious events at defendant's facilities over the course of several months prior to the January 5, 2008, spill. (See Dkt. 252-13, at ECF 11056 & 11060) (discussing various prior incidents at defendant's facilities including "a definite pattern of human-caused destructive acts"). Yet, there is no evidence of any precautions defendant undertook in response to these suspicious incidents.[32] (See, generally, Dkt. 252-2, SUF). Thus, defendant is not entitled to a third party defense because defendant was on notice that its facilities were vulnerable to vandalism. See, e.g., United States v. Timmons Corp., 2006 WL 314457, *10 (N.D. N.Y. 2006) ("if there were security breaches and trespassers on the Real Property, there were no due precautions in place as there was not adequate fencing surrounding the area"); Diamond X Ranch LLC v. Atlantic Richfield Co., 2017 WL 4349223, *18 (D. Nev. 2017) (third party defense unavailable where the release "was not unforeseeable"); Adobe Lumber, Inc. v. Hellman, 658 F.Supp.2d 1188, 1205 (E.D. Cal. 2009) ("While it is undisputed that the [third-parties] were a cause of the contamination, this fact alone does not demonstrate that they were the sole cause, i.e., that the [third-parties'] activities were unforeseeable. Indeed, the fact that the [third-parties'] conduct violated state and local law-standing alone-does not render this conduct unforeseeable as a matter of law."). In short, defendant may not rely on the OPA's third-party defense and the government is entitled to summary judgment with respect to the January 5, 2008, Davis Facility spill.
IV. DEFENDANT'S LIABILITY FOR REMOVAL COSTS.
The government moves to establish defendant's liability for the EPA and the Coast Guard's removal costs under § 1002(a) of the OPA, 33 U.S.C. § 2702(a), asserting that "the United States has incurred $2,486,884.77 in removal costs under Section 311(c) of the CWA, 33 U.S.C. § 1321(c)" consisting of: (1) $423,616.09 in removal costs for overseeing defendant's response to the January 5, 2008, Davis Facility spill, (see Dkt. 252-1, Jt. Br. at 54-55); (2) $1,802,436.17 in removal costs for overseeing and then taking over the response to the January 29, 2008, Bell *1077 Facility spill, (see id. at 55); (3) $5,763.35 in removal costs for directing, monitoring and evaluating defendant's Williams B Facility removal action, (see id. at 55); (4) $50,538.92 in removal costs for directing, monitoring and evaluating defendant's Gato Ponds removal action, (see id. at 55-56); (5) $192,656.07 in removal costs for overseeing defendant's response to the December 27, 2008, Bell Facility spell, (see id. at 56); and (6) $11,871.17 in removal costs for monitoring and evaluating defendant's response to the December 21, 2010, Bell Facility spill. (See id. ).
As discussed above, there are triable issues as to whether Sisquoc Creek and Spring Canyon Tributary possess a significant nexus to a TNW to qualify as navigable waters under the CWA. Accordingly, the government, at this time, is not entitled to the removal costs for the $192,656.07 incurred in connection with the December 27, 2008, Bell Facility spill, the May 1, 2009, Bell Facility spill,[33] and the $50,538.92 incurred in relation to the Gato Ponds removal action. The court finds that defendant is liable for the government's removal costs in the amount of $2,243,686.78 plus interest.
CONCLUSION
Based on the foregoing, IT IS ORDERED THAT:
1. The government's Motion for Partial Summary Judgment is granted in part and denied in part as set forth below.
2. The Motion is granted with respect to defendant's liability under § 311(b) of the CWA, 33 U.S.C. § 1321(b) and § 301(a) of the CWA, 33 U.S.C. § 1311(a), for the June 8, 2005, July 13, 2005, August 11, 2005, July 16, 2007, December 7, 2007, January 29, 2008, October 14, 2010, and December 21, 2010, spills at the Bell Facility, and the December 7, 2005, and January 5, 2008, spills at the Davis Facility. The Motion is also granted with respect to defendant's liability under § 1002(a) of the OPA, 33 U.S.C. § 2702(a), for the government's removal costs in connection with the January 29, 2008, and December 21, 2010, Bell Facility spills, the January 5, 2008, Davis Facility spill, and the March 2008 Williams B Facility tank farm removal action.
3. The Motion is denied with respect to defendant's liability for the December 27, 2008, and May 1, 2009, Bell Facility spills into Spring Canyon Tributary and the April 2008 Gato Ponds removal action.
4. Defendant shall pay the United States the sum of $2,243,686.78 plus the applicable legal rate of interest.
Dated this 20th day of May, 2018.

The parties are familiar with the factual and procedural background of the case. See United States v. HVI Cat Canyon, Inc., 213 F.Supp.3d 1249 (C.D. Cal. 2016). The court repeats the facts here only as necessary.

The government reserves the following issues for trial: (1) defendant's liability for its failure to prepare and implement and/or maintain an Oil Pollution and Prevention program as required under 40 C.F.R. Part 112; (2) the amount of civil penalties for defendant's CWA violations; and (3) the scope of injunctive relief. (See Dkt. 252-1, Jt. Br. at 2).

Unless otherwise noted, the facts set forth in this section are undisputed. To the extent the court relies on evidence to which defendants have raised an objection, (see Dkt. 252-2, Joint Statement of Uncontroverted Facts [ ] ("SUF") ), defendant's objections are overruled. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003), cert. denied, 541 U.S. 937, 124 S.Ct. 1663, 158 L.Ed.2d 358 (2004) (holding that, on summary judgment, the court "do[es] not focus on the admissibility of the evidence's form" but rather "focus[es] on the admissibility of its contents"); Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001) (holding that a party "does not necessarily have to produce evidence in a form that would be admissible at trial" for that evidence to be considered at the summary judgment stage).

Defendant asserts that many of the facts with respect to the discharges are disputed, but it is apparent that much of the evidence cited only goes to whether the waters at issue are jurisdictional under the CWA. For instance, defendant disputes the government's claim that "[o]il from the spill from the Bell Facility on June 8, 2005, reached [Palmer Road Creek.]" (See Dkt. 252-2, SUF at P31). However, the evidence defendant cites relates to its argument that Palmer Road Creek is merely a drainage and the evidence regarding the nature of the oil that was spilled does not contradict the government's assertion that oil did in fact reach Palmer Road Creek. (See, generally, id. ). In its briefing, defendant raises no specific argument regarding the amount of oil or produced water that was discharged. (See, generally, Dkt. 252-1, Jt. Br.).

"In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56-3.

Defendant raises the same arguments as to its potential liability under §§ 311(b)(3) and 301(a) of the CWA. (See Dkt. 252-1, Jt. Br. at 4-7 & 38-41).

With respect to Palmer Road Creek, Cat Canyon Creek and Spring Canyon Tributary, the TNW is the Santa Maria River Estuary. (See Dkt. 252-1, Jt. Br. at 21-23). The closest TNW to the Zaca Tributary is the Santa Ynez River Estuary. (See id. at 25-26).

In Davis, the Ninth Circuit stated that "[a] fractured Supreme Court decision should only bind the federal courts of appeal when a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably be described as a logical subset of the other. When no single rationale commands a majority of the Court, only the specific result is binding on lower federal courts." 825 F.3d at 1021-22.

An ordinary high-water mark is a "line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas." Rapanos, 547 U.S. at 715, 126 S.Ct. at 2237 (quoting 33 C.F.R. § 328.3(e) ).

Defendant filed a Notice of Lodging [of] Supplemental Authority (Dkt. 300), claiming that the Ninth Circuit's recent decision in Hawai'i Wildlife Fund v. Cty. of Maui, 886 F.3d 737 (9th Cir. 2018), supports its contention that Justice Kennedy's significant nexus test is inapplicable outside the context of wetlands. (Dkt. 300 at 2). Hawai'i Wildlife Fund concerned whether a defendant violated the CWA by discharging pollutants from its wells through groundwater and into the Pacific Ocean without first obtaining a National Pollutant Discharge Elimination System permit. See 886 F.3d at 741-43. Relying in part on the Rapanos plurality opinion, the court in Hawai'i Wildlife Fund rejected the defendant's argument that only direct discharges from a point source can violate the CWA. See id. at 748-49. The Ninth Circuit explained it did not apply Justice Kennedy's concurrence because there was no dispute as to whether the Pacific Ocean is a navigable water and declined to decide whether groundwater constitutes navigable water under the CWA. See id. In other words, the significant nexus test was not relevant to the indirect discharge question before the panel. Thus, Hawai'i Wildlife Fund does not support defendant's contention that the significant nexus test does not apply in this case.

Defendant also objects to the government's use of the aggregate impact of all "similarly situated" tributaries in the respective watershed to establish a significant nexus. (See Dkt. 252-1, Jt. Br. at 18-19 & 32). However, as discussed below, the court need not determine whether the government may rely on the impact of "similarly situated" tributaries to reach its conclusions regarding the waters at issue.

Defendant claims that the government "seems to follow" the 2015 Clean Water Rule, which was stayed by the Sixth Circuit, see In re U.S. Dept. of Defense Clean Water Rule, 817 F.3d 261, 263 (6th Cir. 2016), rev'd and remanded sub nom., Nat'l Ass'n of Mfrs. v. Dept. of Defense, --- U.S. ----, 138 S.Ct. 617, 199 L.Ed.2d 501 (2018), as the basis for CWA jurisdiction. (See Dkt. 252-1, Jt. Br. at 19; Dkt. 264, HVI Cat Canyon, Inc.'s Supplemental Memorandum [ ] ("Def.'s Suppl. Br.") at 3-5). However, on remand, the Sixth Circuit has since vacated the stay. See In re U.S. Dept. of Defense, 713 Fed.Appx. 489, 490-91 (6th Cir. 2018). Defendant also points out that the President has directed the EPA to consider interpreting the term "navigable waters" in a manner consistent with the plurality opinion in Rapanos, (see id. ), but does not cite any authority in support of this argument. (See, generally, Dkt. 252-1, Jt. Br. at 19). In any event, the spills here occurred between 2005 and 2010, meaning "the 2015 EPA Clean Water Rule was not in effect when [the] discharges occurred and [the 2015 Clean Water Rule] therefore does not govern this case." Foster, 2017 WL 3485049, at *8. Thus, the court agrees with the government's assertion that "the regulation in place at the time of Defendant's spills controls." (Dkt. 252-1, Jt. Br. at 22 n. 11); see, e.g. Robertson, 875 F.3d at 1293 (finding that defendant was on notice that conduct was illegal under CWA where "conduct at issue ... took place between October 2013 and October 2014, well after [Ninth Circuit] had issued City of Healdsburg and had held that Justice Kennedy's test controlled CWA jurisdiction, and well before [the Circuit's] decision in Davis."); Jones Creek Investors, LLC v. Columbia Cty., Ga., 2016 WL 593631, *6 (S.D. Ga. 2016) (no indication that the 2015 Clean Water Rule should be applied retroactively).

It is undisputed that precipitation during the wet season in this part of California is "highly erratic" or at most "weakly cyclical" "as compared to other regions with Mediterranean climates around the world." (Dkt. 252-3, Lee Report at ECF 10184; see, generally, Dkt. 252-1, Jt. Br.). The wet season in Santa Barbara County usually runs from October through April. (See Dkt. 252-3, Lee Report at ECF 10184). Between 2008 and 2016, when Dr. Lee collected the data for his report, California frequently faced various degrees of drought which impacted the amount of runoff in the waters at issue. (See id. ) (noting that "over the last four years, California has been in a deep and persistent drought, especially in 2014" and that "there is evidence that this drought is the most severe drought in the last 1200 years") (also showing that Santa Maria faced severe drought conditions in 2008 and 2009, normal conditions in 2010 and 2011, moderate drought conditions in 2012, and extreme drought conditions from 2013 to August 31, 2016). Thus, the significant decrease in observed flow at Palmer Road Creek is consistent with the drought conditions at the time.

Thus, contrary to defendant's suggestion, (Dkt. 252-1, Jt. Br. at 46-47), Dr. Lee's report does not rely only on the impact of similarly situated tributaries for his significant nexus analysis. (See Dkt. 252-12, Josselyn Decl. at ¶¶ 23-27).

Dr. Josselyn conducted site investigations at the relevant facilities and waters at issue between November 2-4, 2010, and also "reviewed aerial photographs and relevant information and reports pertaining to these features; complied data from various public data sources; used accepted techniques and models to evaluate flow and frequency of discharge[.]" (Dkt. 252-12, Josselyn Decl. at ¶ 3; id., Josselyn Report at ECF 10892).

Defendant suggests it is significant that Palmer Road Creek is locally known as "asphalt creek" and was previously used by oil companies to transport oil. (See Dkt. 252-1, Jt. Br. at 3). However, even a manmade waterway may be jurisdictional under the CWA, and "numerous courts have concluded that artificial waterways may be jurisdictional waters under the CWA." Tri-Realty Co. v. Ursinus College, 124 F.Supp.3d 418, 468 (E.D. Pa. 2015) (collecting cases); see ONRC Action v. United States Bureau of Reclamation, 2012 WL 3526833, *22 (D. Or. 2012) ("The fact that the Drain is man-made does not preclude the finding that it is also a 'tributary' and therefore a 'water of the United States.' ")

Dr. Josselyn's report is significantly less comprehensive than Dr. Lee's and relies on a much smaller set of data as Dr. Josselyn was only in the field for three days between November 2-4, 2010. (See Dkt. 252-12, Josselyn Report at ECF 10892). In addition, his report does not contain any analysis of Cat Canyon Creek, (see, generally, Dkt. 252-12, Josselyn Report), although he does refer to a "Cat Canyon Tributary" which is located near the Williams B Facility and flows into Cat Canyon Creek. (See Dkt. 252-12, Josselyn Report at ECF 10897-98).

The Guidebook states:
Ephemeral waters in the arid west that are tributaries may have a significant nexus to a TNW. For example, in some cases they may serve as a critical transitional area between the upland environment and the traditional navigable waters. Such ephemeral tributaries, with the associated riparian corridor, may provide refuge, foraging and breeding opportunities in areas that may have limited stands of vegetation and water due to the environmental conditions of the arid southwest. During and following precipitation events, ephemeral tributaries collect and transport water or sometimes sediment from the upper reaches of the landscape to the traditional navigable waters. These ephemeral tributaries, and associated riparian corridors, may provide habitat for wildlife and aquatic organisms. These biological and physical processes may further support nutrient cycling, sediment retention and transport, pollutant trapping and filtration, and improvement of water quality, functions that may affect the integrity of a TNW.
(Dkt. 252-14, Evid. Appx., Guidebook at ECF 11184).

Dr. Josselyn appears to suggest that any flow caused by human intervention such as release from a dam cannot be considered in a significant nexus analysis, but he offers no authority for his position. (See, generally, Dkt. 252-12, Josselyn Report). In any event, it is irrelevant whether the tributaries reach downstream navigable waters "as the result of human engineering. District courts within the Ninth Circuit have consistently rejected the notion that whether a water is a 'tributary' depends on whether it reaches a traditionally navigable water by means of 'natural' or 'artificial' flow." ONRC Action, 2012 WL 3526833, at *23.

With respect to the existence of an OHWM, Dr. Josselyn concedes that Palmer Road Creek exhibits an OHWM, (see Dkt. 252-12, Josselyn Decl. at ECF 10878 & ¶ 4), but does not address whether Cat Canyon Creek exhibits an OHWM, (see, generally, id. at ECF 10879 & ¶ 8) and claims that Zaca Tributary has "a sporadic OHWM." (See id. at ECF 10880 & ¶ 11). Dr. Josselyn only looked for the presence of an OHWM "by walking the entire length [of the waters] at issue] in proximity to the facility[,]" (see Dkt 10901, Josselyn Report at ECF 10901), but he did not map the entire length of the water. (See, generally, id.; see also Dkt. 252-3, Rebuttal Expert Report of Dr. Lee ("Lee Rebuttal Report") at ECF 10106-07 (noting that during his own "direct field observations" many of "these systems have prominent, but not always continuous ... [OHWM]") ). Thus, Dr. Josselyn's observations do not create a triable issue of fact regarding whether Cat Canyon Creek, Palmer Road Creek and Zaca Tributary possess an OHWM.

Dr. Lee's use of gauge data, statistical data, personal observations, is consistent with the Guidebook which states:
Principal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a TNW. Field staff will consider all available hydrologic information (e.g., ga[u]ge data, flood predictions, historic records of water flow, statistical data, personal observations/records, etc.) and physical indicators of flow including the presence and characteristics of a reliable OHWM with a channel defined by bed and banks. Other physical indicators of flow may include shelving, wracking, water staining, sediment sorting, and scour (Appendix H). Consideration will be given to certain relevant contextual factors that directly influence the hydrology of tributaries including the size of the tributary's watershed, average annual rainfall, average annual winter snow pack, slope, and channel dimensions.
(Dkt. 252-14, Evid. Appx., Guidebook at ECF 11185).

Dr. Josselyn's rebuttal report also argues that Dr. Lee improperly relies on data from monitoring stations located outside the "relevant reach" of the respective waters at issue, suggesting that Dr. Lee's analysis "significantly overestimate[s] flow" at those sites. (Dkt. 252-12, Rebuttal Report by Michael Josselyn [ ] ("Josselyn Rebuttal") at ECF 10953-54). However, Dr. Josselyn's own application of the "relevant reach" analysis appears to be inconsistent with the definition of "relevant reach" he cites from the Guidebook. (Id. at ECF 10955-56). For example, the "relevant reach" for Zaca Tributary is "the entire reach of the stream that is of the same order (i.e. from the point of confluence, where two lower order streams meet to form a tributary, downstream to the point such a tributary enters a higher order stream)[.]" (Id. at ECF 10955). Accordingly, there is no basis for Dr. Josselyn to only consider water flow at the higher point of the tributary (Zaca Tributary Transect 3) when the other water loggers are located downstream but before Zaca Tributary enters a higher order stream (Zaca Creek). (See Dkt. 252-5, Evid. Appx. at ECF 10307-308) (showing locations of water level loggers in Zaca Tributary).

Given "the similarity of the CERCLA response cost remedy, courts interpreting OPA's removal cost provisions have looked to CERCLA response cost jurisprudence for guidance[.]" United States v. Viking Resources, Inc., 607 F.Supp.2d 808, 830 (S.D. Tex. 2009) ; United States v. Brothers Enterprises, Inc., 113 F.Supp.3d 907, 913 (E.D. Tex. 2015) (noting that courts often look to CERCLA when interpreting the OPA).

"[O]ld tank batteries meet the statutory definition of 'facility' for purposes of the OPA." United States v. Cedyco Corp., 2014 WL 4639520, *5 (W.D. La. 2014).

The Gato Ponds are located approximately 100 feet from Sisquoc Creek. (Dkt. 252-2, SUF at P147-148). Wise determined that the Gato Ponds posed a substantial threat of discharge of oil and on April 30, 2008, the EPA issued an administrative order that required defendant to "remove all liquids from the Gato Ponds; remove or decontaminate infrastructure and surface impoundments at the Gato Ponds; and remove contaminated soil under and around the Gato Ponds." (Dkt. 252-11, Evid. Appx., Declaration of Robert Wise [ ] ("Wise Decl.") at ECF 10661 & ¶¶ 22-23). As previously discussed, a triable issue remains as to whether Sisquoc Creek is jurisdictional under the CWA or the OPA. See, supra, at § 2.A. Accordingly, the court will only address whether the EPA's decision to order the removal of the tank farm at the Williams B Facility was arbitrary and capricious.

As evidence that Wise unnecessarily incurred excessive removal costs, defendant cites the decision to deploy "six members from the Coast Guard Strike Team[.]" (See Dkt. 252-1, Jt. Br. at 59-60). The "Strike Team" was "paid for being there for the Bell Lease incident" and "to assist Rob Wise in monitoring contractor work at the Davis Tank Battery spill and the Bell lease[.]" (Dkt, 252-13, Deposition of Robert Hildebrand at ECF 11100). Defendant does not cite any authority in support of this argument or to any provisions in the NCP regarding the deployment of this "Strike Team," (see, generally, id. ), and the undisputed evidence shows there were at least two significant spills on defendant's properties in January 2008 including the January 5, 2008, spill from the Davis Facility and the January 29, 2008, spill at the Bell Facility. (See Dkt. 252-2, SUF at P162 & P164). Moreover, it is undisputed that the EPA took over the removal action following the January 29, 2008, spill because defendant "continued to employ a contractor that lacked the health and safety training necessary to perform hazardous waste cleanups." (Id. at P165). In light of this evidence, there is no basis to conclude that the deployment of the Strike Team was intended in any way to punish defendant and incur additional costs.

For example, defendant claims that Wise stated he wanted to "teach" defendant a "lesson," threatened defendant's executives with jail, took joy in defendant's possible bankruptcy, and claimed to have the authority to force defendant to "dig up as much of the Bell Creek as he desired." (Dkt. 264, Def.'s Suppl. Br. at 12).

When there is a discharge of oil, the NCP directs the OSC to "promptly initiat[e] a preliminary assessment" based on "available information, supplemented where necessary and possible by an on-scene inspection." 40 C.F.R. § 300.305(a) & (b). In determining whether a discharge represents "a substantial threat to public health," factors the OSC considers include, but are not limited to, "the size of the discharge, the character of the discharge, and the nature of the threat to public health or welfare of the United States." 40 C.F.R. § 300.322(a). "Upon obtaining such information, the OSC shall conduct an evaluation of the threat posed, based on the OSC's experience in assessing other discharges, and consultation with senior lead agency officials and readily available authorities on issues outside the OSC's technical expertise." Id.

In addition, even if the EPA's removal costs were somehow limited by the NCP, "EPA response costs are presumed consistent with the National Contingency Plan unless a responsible party overcomes this presumption by establishing the EPA's response action giving rise to the costs is inconsistent with the National Contingency Plan." United States v. E.I. Dupont De Nemours & Co. Inc., 432 F.3d 161, 178 (3d Cir. 2005) (citing United States v. Northeastern Pharm. & Chem. Co., Inc., 810 F.2d 726 (8th Cir. 1986) ); see Am. Cyanamid Co., 786 F.Supp. at 161 (defendant has the burden of showing an inconsistency with the NCP and "all costs' incurred by the United States not inconsistent with the NCP are conclusively presumed to be reasonable, and whether costs are 'necessary' or 'cost-effective' are relevant only to the extent that the NCP imposes those requirements"). Here, there is no evidence that the government's response action was inconsistent with the NCP. (See, generally, Dkt. 252-2, SUF); see Iron Mountain Mines, 724 F.Supp.2d at 1091 (after government presents evidence of removal costs, "the burden shifts to Defendants to prove that the government's response action was inconsistent with the NCP.").

Defendant suggests the viscosity of the type of oil at its facilities together with the distance to the nearest water "nullified the existence of any substantial threat," (see Dkt. 252-1, Jt. Br. at 44-45), but cites no evidence to support this assertion. (See, generally, id.; Dkt. 252-12, Josselyn Report at ECF 10904-06 (noting distance to facility but providing no explanation or support as to why oil could not reach relevant water); (see also Dkt. 252-3, Lee Rebuttal Report at ECF 10108) (noting that Dr. Josselyn simply assumes that oil cannot reach the waters at issue "if there is any distance between the water and the facility").

Courts also look to CERCLA in interpreting the OPA's third-party defense. See, e.g., Int'l Marine Carriers v. Oil Spill Liability Trust Fund, 903 F.Supp. 1097, 1105 (S.D. Tex. 1994) ("The OPA section 2703(a)(3) defense is analogous to the CERCLA section 9607(b)(3) third-party defense.").

Given defendant's speculation that one of its former employees was responsible for the vandalism, (see Dkt. 252-1, Jt. Br. at 51), defendant provided no evidence that it exercised due care and took proper precautions to ensure that a former employee, especially a disgruntled former employee, could not cause any damage to its facilities. For example, there is no evidence that defendant took away the employee's keys, access cards, etc. after the employee's employment was terminated. (See, generally, Dkt. 252-2, SUF). Given that the purported third party had an employment relationship with defendant, and that defendant was in the best position to know whether there were any concerns with any particular employee, it was incumbent upon defendant to take all reasonable precautions to protect against vandalism by former employees.

The court has been unable to determine how much the EPA or the Coast Guard allegedly incurred as a result of the May 1, 2009, spill. (See, generally, Dkt. 252-1, Jt. Br.; Dkt. 252-2, SUF).